1

2

3

4

5

6            UNITED STATES DISTRICT COURT

7          EASTERN DISTRICT OF CALIFORNIA

8

9   KRISTEE CHANDLER,            )   1:07-cv-0981 OWW GSA
                                 )
10               Plaintiff,      )   SCHEDULING CONFERENCE ORDER
                                 )
11      v.                       )   Discovery Cut-Off: 3/2/09
                                 )
12   CALIFORNIA STOCKMEN BANK, DAVE )   Non-Dispositive Motion
     McMAHON, MARK ULIBARRI, BILL )   Filing Deadline: 3/16/09
13   KITCHEN, and GINNY HOPPER,  )
                                 )   Dispositive Motion Filing
14               Defendants.     )   Deadline: 3/30/09
                                 )
15   _____ )   Settlement Conference Date:
                                     3/11/09 10:00 Ctrm. 10
16
                                     Pre-Trial Conference
17                                   Date: 6/8/09 11:00 Ctrm. 3

18                                   Trial Date: 7/21/09 9:00
                                     Ctrm. 3 (JT-10 days)
19

20

21   I.   Date of Scheduling Conference.

22        December 7, 2007.

23   II.  Appearances Of Counsel.

24        Law Offices of Jacob M. Weisberg by Jacob M. Weisberg, Esq.,

25   appeared on behalf of Plaintiff.

26        Epstein Becker & Green, P.C., by Matthew A. Goodin, Esq.,

27   appeared on behalf of Defendants.

28   ///

                              1

III.   Summary of Pleadings.

1.   Plaintiff asserts claims for sexual harassment and gender discrimination under both Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, et seq.) and the California Fair Employment and Housing Act, California Government Code §§ 12940 et seq., and retaliation for complaining of harassment in violation if California Government Code §§ 12940 et seq. Chandler brings this case against California Stockmen's Bank (which was acquired by National Bank of Arizona in early 2007), and individual Defendants Mark Ulibarri, Commercial Loan Officer; Bill Kitchen, Executive Vice President and Regional Manager; Dave McMahon, Branch Manager; and Ginny Hopper, Operations Supervisor.

2.   Ms. Chandler began her employment with Stockmen Bank on April 14, 2003, in Hanford, California.  She worked as a New Accounts Representative from date of hire until her termination on February 5, 2007.

3.   Her responsibilities as a New Accounts person included opening new accounts such as checking, certificates of deposit, and savings accounts.  While working in new accounts, Plaintiff worked closely with the loan officer, Mark Ulibarri, hereinafter referred to as Mr. Ulibarri.  Mr. Ulibarri and Ms. Chandler became close friends during the course of time they worked on the platform together.  They also became friends to the point that they shared personal issues with one another.  Both have children and had conversations about their children.  Mr. Ulibarri is married and Ms. Chandler divorced.

4.   In or about late October 2005, Mr. Ulibarri began to share with Ms. Chandler that he was having problems in his

2

1   marriage and that he wanted to divorce his wife.  Since Ms.
2   Chandler was divorced and had recently been through the process,
3   she was able to give him helpful advice.  Ms. Chander advised Mr.
4   Ulibarri to try to make his marriage work.  As time went on they
5   began to confide their problems with one another as friends do.
6   Ms. Chandler always kept her conversations with Mr. Ulibarri on a
7   friendship level and was very careful not to let it appear to be
8   anything more than a work site friendship.

9        5.    That relationship began to change, however, because of
10  actions taken by Mr. Ulibarri.  Every year the bank sponsored an
11  annual holiday dinner in Kingman, Arizona.  Ms. Chandler decided
12  to attend for the first time.  The holiday party was on December
13  10, 2005.  When Mr. Ulibarri heard what Ms. Chandler's plans
14  were, he approached Ms. Chandler and asked if he could get a ride
15  back to Las Vegas because he wanted to gamble and then he would
16  fly from Las Vegas to Fresno on the Sunday following the event.
17  Ms. Chandler asked Mr. Ulibarri if his wife would mind that a
18  single women would be driving him back to Las Vegas and he
19  laughed and said no, she would be fine with it.

20       6.    Ms. Chandler did not feel comfortable at the time but
21  agreed to give Mr. Ulibarri a ride to Las Vegas after he returned
22  from lunch with a note from his wife giving permission to give
23  him a ride.  After speaking with Mr. Ulibarri's wife directly,
24  she assured Ms. Chandler that she was okay with Ms. Chandler
25  giving Mr. Ulibarri a ride back to Las Vegas.  Shortly after
26  that, Mr. Ulibarri began to change the driving plans.  He then
27  stated he would go to Las Vegas to pick Ms. Chandler up in the
28  company rental car, because she was already going to be in Las

1   Vegas visiting her sister.  He stated by picking Ms. Chandler up
2   this would give him time to get a room at the Rio and do some
3   gambling before they headed to Kingman for the holiday dinner.
4   He had also made arrangements for a car (limo) provided by the
5   Rio to take Ms. Chandler and himself back to Las Vegas from
6   Kingman, Arizona.

7        7.   When Ms. Chandler asked Mr. Ulibarri why he was doing
8   all this he told her so she would not have to pay for the gas if
9   he used his car and that the company would pay for it.  He also
10  stated that it was better this way.  That night in Las Vegas, Mr.
11  Ulibarri propositioned Ms. Chandler by asking her to stay with
12  him.  Ms. Chandler said "No.  I told him I wasn't interested in
13  having an affair or a one night stand."  Mr. Ulibarri went on to
14  tell Ms. Chandler that he wasn't happy in his marriage and that
15  he was looking into a divorce.  Mr. Ulibarri also went on to say
16  that he was starting to have feelings for her.  Ms. Chandler
17  again said to him that she wasn't interested.  She had divorced
18  her ex-husband for cheating on her and was not interested in a
19  man that would cheat.  Ms. Chandler told him, "once a cheater,
20  always a cheater."

21       8.   Mr. Ulibarri began to send Ms. Chandler text messages.
22  On her drive back from Las Vegas, Mr. Ulibarri sent her text
23  messages that said he had had an affair with the new accounts
24  girl at the previous bank he had worked for and the affair ended
25  not long after he started working for Stockmen's Bank.  Ms.
26  Chandler told him all he was doing was repeating the cycle by
27  trying to start something with her.  He said that what he felt
28  for her was different.  Ms. Chandler again told him that she was

                              **4**

1  not interested but that did not stop his pursuit.

2      9.   Mr. Ulibarri began to pursue Ms. Chandler on a daily
3  basis.  He would leave water bottles on her desk at work that he
4  had gotten at the Rio.  Ms. Chandler would get text messages
5  asking her to go to Las Vegas with him.  On January 27, 2006, Mr.
6  Ulibarri sent Ms. Chandler an e-mail asking her to meet him in
7  Las Vegas and that he would pay her way if she would just agree
8  to go with him.

9      10.  On January 9, 2006, Ms. Chandler changed her cell phone
10 number to stop the text messages.  Mr. Ulibarri told Ms. Chandler
11 that he was going to leave his wife but that he needed to know
12 there would be someone waiting for him.  Sometimes he would tell
13 her that he and his wife had spoken and that they were going to
14 try to make things work.  Ms. Chandler encouraged him to work on
15 his marriage and even gave him a book that she had purchased
16 called "Affairs."  The book talks about "The Split Self Affair"
17 and how this person builds a friendship with a colleague at work
18 and starts an affair with them.  Ms. Chandler showed it to Mr.
19 Ulibarri and told him he was trying to make her that colleague.
20 Ms. Chandler told Mr. Ulibarri over and over again that she was
21 not interested in starting a relationship with him.  She told him
22 she had worked very hard in putting her life back together after
23 her divorce.  She told him that it was against her principles to
24 have an affair with a married man.

25      11.  In or about early January 2006, Ms. Chandler told a
26 fellow employee, Lourdes Torres, about the sexual harassment from
27 Mr. Ulibarri.  She showed her the text messages she was receiving
28 from Mr. Ulibarri.  Ms. Chandler told Mr. Ulibarri that she had

told Lourdes about the harassment.  Ms. Chandler did this in the hope of getting him to stop bothering her.  He responded with "you're going to get us fired."  This stopped the harassment for a little while, but not for long.

12.  On February 14, 2006, Valentine's Day, Ms. Chandler had gone up to the boiler room to turn off the boiler to the heater in the bank and Mr. Ulibarri followed her up there.  While in the boiler room, he grabbed Ms. Chandler and kissed her.  Ms. Chandler pushed him away saying "no" and got out of there as quickly as she could.  When she came back downstairs, Mr. Ulibarri's wife and little girls came in with Valentine gifts for him and cupcakes for the bank employees.

13.  On or about early April 2006, Mr. Ulibarri said that he would be going to Las Vegas on May 5, 2006.  He wanted Ms. Chandler to go with him.  Ms. Chandler again told him "no."  She told him she was not interested in having an affair.  During the week preceding May 5, 2006, at different times during the work day, he would bring up May 5th, trying to convince her to go with him to Las Vegas.  He again stated that he would pay her way. The more Ms. Chandler would tell him "no," the more aggressive he would get.

14.  Mr. Ulibarri would go over to Ms. Chandler's desk and say "Just one time, that's all I'm asking for, just have sex with me one time, and then I will leave you alone."  On Ms. Chandler's breaks at work, he would come looking for her.

15.  In April 2006, on one occasion while Ms. Chandler was in the break room alone and while she had her head down on the table, Mr. Ulibarri came in and ran his hand along the back of

6

1  Ms. Chandler's neck.  Ms. Chandler backed away and asked him not
2  to touch her.  He would just smile and would touch her again when
3  it was convenient for him to do so.  This progressed to hitting
4  Ms. Chandler playfully in front of other co-workers.

5       16.  In May 2006, while working on a mail merge project for
6  his manager, Mr. Ulibarri needed help with his computer as the
7  mail merge was not working for him.  While kneeling down next to
8  his keyboard, he grabbed Ms. Chandler's buttock.  In the process
9  of him grabbing her buttock, she grabbed his hand and was able to
10 almost slip his wedding ring off.  Ms. Chandler told him if she
11 had gotten it she would keep it and hand deliver it to his wife.
12 For the next three weeks, he stopped wearing his wedding ring.

13      17.  On or about May 2006, Mr. Ulibarri told Ms. Chandler he
14 and Luis were going to Fresno to meet with clients and he asked
15 if this was Ms. Chandler's son's weekend with his dad.  When Ms.
16 Chandler told him it was, he said "I was thinking I could meet
17 you in Fresno just one time."  At that point, Ms. Chandler cut
18 him off and again stated that she wasn't interested and did not
19 want to hear any more about what he was thinking.  Mr. Ulibarri
20 tried on several occasions to tell Ms. Chandler about his Fresno
21 "plans" but every time Ms. Chandler would cut him off and say she
22 was not interested.

23      18.  On or about February, 2006, Mr. Ulibarri told Ms.
24 Chandler that they could meet at work early before any one got
25 there and have sex on the conference table.  He also told her
26 that she would not be the other woman.  On or about February 20,
27 2006, he sent Ms. Chandler a text message stating, "I wish there
28 was an easy answer, but I'm going to the office, meet me."

1     19.   On or about May, 2006, Mr. Ulibarri offered to buy Ms.

2  Chandler a Harley motorcycle.   Mr. Ulibarri also stated that his

3  fantasy was for a woman to wear high heels and he would come up

4  behind her and enter her from behind.   Then he stated "wearing

5  shoes like yours, Kristee."

6     20.   Mr. Ulibarri would park his car so close to Ms.

7  Chandler's car that his front bumper would almost be touching her

8  back bumper.   When she told him to back off, he would tell her it

9  was a sign of what they should be doing.   He also sent her a text

10  message stating the same thing.

11     21.   Matters accelerated when Mr. Ulibarri's wife called Ms.

12  Chandler and asked her to stay away from her husband.   Ms.

13  Chandler believes that Mr. Ulibarri's wife got her number off of

14  her husband's cellular phone.   Ms. Chandler then told Mr.

15  Ulibarri's wife that it was her husband who had been harassing

16  her and that he had been text messaging her.   Mrs. Ulibarri then

17  began to get extremely upset when Ms. Chandler explained

18  everything that her husband had been doing.   She asked Ms.

19  Chandler to talk to her further and that she wanted her marriage

20  to work out.   Ms. Chandler explained that she had no interest in

21  her husband and she had considered her husband a friend and that

22  he had crossed that line when he began to pursue a relationship

23  with her.   Mrs. Ulibarri began to call Ms. Chandler on a daily

24  basis until Ms. Chandler reported the entire situation to her

25  supervisor, Defendant Harper, Customer Service Manager.   Ms.

26  Chandler did not report the harassment prior to this date in fear

27  of retaliation by Defendant Ulibarri, Defendant Dave McMahon, the

28  Manager, and other supervisors and staff.   Mr. Ulibarri was very

1  well liked and many people just thought he was a nice person.

2  Ms. Chandler was afraid of being treated differently once she

3  reported the harassment.  Ms. Chandler believed that due to the

4  fact that she is a single woman, everyone would think she was the

5  aggressor and went after a married man.

6      22.  And indeed, her worst fears of retaliation were

7  justified.  Ms. Chandler reported the sexual harassment to

8  Defendant Hopper in late June, 2006, who referred the matter to

9  Defendant Kitchen, the Regional Manager.  There was no formal

10  investigation other than Mr. Kitchen telling both Ms. Chandler

11  and Mr. Ulibarri that they were both at fault.  He stated that

12  they both should have been fired but that they were going to

13  allow them to keep their jobs.

14      23.  In early to mid-July, 2006, Mr. Ulibarri was moved to

15  the Lemoore branch but was allowed to continue to attend weekly

16  bank meetings and sales meetings.  Ms. Chandler was then asked to

17  stop attending sales meetings.

18      24.  After Ms. Chandler reported the harassment to Ms.

19  Hopper, Mr. McMahon and other staff members began to treat her

20  differently than they treated Mr. Ulibarri.  Her supervisors and

21  co-employees saw Mr. Ulibarri as the victim and Ms. Chandler as

22  the aggressor, just as Ms. Chandler imagined it would be.  Ms.

23  Chandler was treated as if she had the plague.  Ms. Hopper and

24  Mr. McMahon did not speak to her at all unless they absolutely

25  had to.  Mr. McMahon treated her like she was not even in the

26  building.

27      25.  Immediately after Ms. Chandler reported the harassment

28  by Mr. Ulibarri, Ms. Chandler noticed she was being watched in

1  regards to her work productivity and time she spent with clients.

2  Ms. Chandler's job duties were being taken away a little at a

3  time.  Prior to Ms. Chandler reporting the sexual harassment, she

4  was a full-time new accounts representative, and at the time of

5  her termination, she was part-time new accounts and part-time

6  teller.  She was expected to get both jobs done in a timely and

7  productive manner with no room for mistakes.  If mistakes were

8  made, a copy of those mistakes were taken and placed in Ms.

9  Chandler's personnel file.  During this time, however, Ms.

10  Chandler was never written-up.  She knew she was being watched

11  and she always gave it 100 percent.

12      26.  On or about November, 2006, Ms. Chandler's desk was

13  moved from the platform and placed directly in front of Mr.

14  McMahon's desk and in clear view of Ms. Hopper's desk.  Ms.

15  Chandler had been employed since April 2003 and this placement of

16  her desk only occurred after she reported the harassment by Mr.

17  Ulibarri.

18      27.  On February 5, 2007, Ms. Chandler was terminated from

19  her employment and the reason given by her employer was that two

20  customers had written to the corporate office and complained

21  about her, stating she had breached customer confidentiality.  No

22  details about the complaints were given to her and she was never

23  given the opportunity to respond and defend herself.

24      28.  The termination was retaliation for Ms. Chandler's

25  complaint regarding the sexual harassment by Mr. Ulibarri.  The

26  Defendant bank officers were upset that Mr. Ulibarri was moved to

27  the Lemoore branch and they wanted Mr. Ulibarri at the Hanford

28  branch even if it meant they would have to get rid of Ms.

1  Chandler.   This is evident as Mr. Ulibarri was brought back to

2  work at Ms. Chandler's branch the week prior to Ms. Chandler's

3  termination.

4      29.   Plaintiff was hired by Stockmen's Bank in April 2003 as

5  a New Accounts Representative.  Defendant Mark Ulibarri started

6  his employment with the Bank in September 2004 as a Commercial

7  Loan Officer.  Very shortly after he started, Ms. Chandler, who

8  sat at a desk right next to Mr. Ulibarri, began telling him about

9  various personal issues, such as her divorce and ongoing custody

10 battle with her ex-husband.  He tried to be friendly, and started

11 listening to her problems.  They became somewhat close in this

12 fashion, and over time they became friends and occasionally went

13 out to lunch together.

14      30.   The Bank's holiday party in December 2005 was held in

15 Laughlin, Nevada.  Mr. Ulibarri was flying out of Las Vegas the

16 morning after the Christmas party, and Ms. Chandler was staying

17 in Las Vegas with her sister.  Accordingly, Mr. Ulibarri and Ms.

18 Chandler made plans to drive from the party to Las Vegas

19 together.  They made the drive, they went on some rides together

20 at one of the casinos, and afterwards he walked her to her car.

21      31.   However, after this incident, Mr. Ulibarri could tell

22 that Ms. Chandler started having feelings for him.  She sent him

23 text messages frequently.  He told her that they needed to keep

24 things professional and he asked her to stop text messaging him.

25 After this conversation, things went very well for approximately

26 one month.  Later, however, she again began to send him text

27 messages, and his wife saw one of the text messages and replied

28 to Ms. Chandler asking her to stop sending text messages to her

husband.  Ms. Chandler then went to Mr. Ulibarri's home on a day where Mr. Ulibarri was working and confronted his wife.  Ms. Chandler tried to convince Mr. Ulibarri's wife that Mr. Ulibarri had feelings for Ms. Chandler and that Ms. Chandler would be better for him than his wife.  Ms. Chandler also asked her if she was aware that Mr. Ulibarri had accounts at the bank without her name on them.

32.  After this incident, Mr. Ulibarri tried to limit his interactions with Ms. Chandler at work.  Thereafter, Ms. Chandler came to his desk and confronted him asking him "so, is this how it's going to be?  Mr. Ulibarri asked her if they could deal with the situation later, and she replied that she could get him fired.  At this point, Ms. Chandler went to speak with Defendant Ginny Hopper, Operations Supervisor.  Executive Vice President Bill Kitchen promptly initiated an investigation into Ms. Chandler's complaint.  He interviewed Ms. Chandler on or about July 21, 2006, who claimed that Mr. Ulibarri began "flirting" with her and making references to sex in December 2005.  She claims that she told Mr. Ulibarri she did not want to be the "other woman."  She claimed that Mr. Ulibarri's wife intercepted some of their text messages, and after that Mr. Ulibarri gave her the "silent treatment."  Ms. Chandler also showed Mr. Kitchen some cell phone text messages which, while they did not necessarily disclose that any sexual conduct had taken place, certainly appeared to disclose that there was at least some flirtation going on between Ms. Chandler and Mr. Ulibarri.

33.  On or about July 24, 2006, Bill Kitchen and Ginny Hopper called Mr. Ulibarri into his office and informed him that

1   there had been a complaint of sexual harassment made against him.

2   Defendant Kitchen interviewed Mr. Ulibarri concerning Ms.

3   Chandler's accusations.   Mr. Ulibarri told Mr. Kitchen that it

4   was Ms. Chandler who had made it clear that she had feelings for

5   him.   Mr. Ulibarri told Mr. Kitchen that Ms. Chandler had visited

6   his wife and urged her to leave Mr. Ulibarri so that Ms. Chandler

7   and Mr. Ulibarri could be together.   Ms. Chandler had told Mr.

8   Ulibarri's wife that Mr. Ulibarri had accounts at the Bank

9   without her name on them.   Mr. Ulibarri was upset to learn of

10  this, asserting that this was a violation of the Bank's policies

11  regarding the privacy of account information.   He also told Mr.

12  Kitchen that Ms. Chandler had called him using a private, blocked

13  phone number, and that the only way she could have obtained that

14  phone number would be through his confidential bank account

15  information.   He further stated that on July 20, 2006, Ms.

16  Chandler told him that "this not talking sucks" and that she

17  wanted things to go back to the way they had been.   When Mr.

18  Ulibarri replied that he could not talk at that time, she

19  responded that she could "get him fired."   The next day, she

20  confronted him again, asking "Is this the way it's going to be?

21  I warned you!"   Within a day or two, Mr. Ulibarri was notified

22  that Ms. Chandler had complained to Ginny Hopper that Mr.

23  Ulibarri was sexually harassing her.   Mr. Kitchen also referred

24  to the text messages Ms. Chandler had shown him, but Mr. Ulibarri

25  showed Mr. Kitchen how simple it was to make cell phone text

26  messages appear as though they originated from another user.

27      34.   Mr. Kitchen also interviewed a co-worker who told Mr.

28  Kitchen that Ms. Chandler liked Mr. Ulibarri and confided in him.

13

1  She also recalled that when they were watching a sexual

2  harassment training video, Ms. Chandler asked if it was against

3  bank policy for employees to date each other.

4      35.   Finally, Mr. Kitchen interviewed Mr. Ulibarri's wife,

5  Eva.  She told Mr. Kitchen that she had seen Ms. Chandler's text

6  messages on her husband's cell phone and first asked Mr. Ulibarri

7  to tell Ms. Chandler to stop.  Ms. Chandler continued texting her

8  husband, and Eva called Ms. Chandler to ask her to stop texting

9  her husband.  Ms. Chandler told Eva that Mr. Ulibarri wanted a

10  relationship with her (Ms. Chandler), and that they had slept

11  together on St. Patrick's Day.  Eva knew this was not true

12  because Ms. Ulibarri had come home for lunch that day.  Ms.

13  Chandler then showed up at the Ulibarris' home and told Eva that

14  Mr. Ulibarri wanted a divorce.  She then began "fantasizing"

15  asking, "Does Ulibarri put the toothpaste cap on?  Does he give

16  Eva the silent treatment?  Does he like to hold hands?  Ms.

17  Chandler talked about her own divorce and suggested that Eva

18  should just "pack up and leave."  Finally, Eva told Mr. Kitchen

19  that Ms. Chandler told her that Mr. Ulibarri had accounts at the

20  Bank without her name on them.

21      36.   Mr. Kitchen then met again with Ms. Chandler and asked

22  her specifically whether she had violated Bank policy by

23  disclosing Mr. Ulibarri's confidential account information.  She

24  denied having done so.  Mr. Kitchen asked if she went to the

25  Ulibarris' home to confront Mr. Ulibarri's wife.  She admitted

26  that she had done so, but claimed that Mr. Ulibarri's wife asked

27  her to come to the house so that Mr. Ulibarri's wife could

28  confront Mr. Ulibarri because he was lying.

1    37.   Following his investigation, Mr. Kitchen met with Tom

2  Dobbins in Human Resources and Bank President, Farrell Holyoak.

3  Mr. Kitchen did not know whom to believe – it was a classic "he

4  said, she said" situation.   They ultimately agreed to give both

5  Ms. Chandler and Mr. Ulibarri a strong counseling memorandum

6  reminding them both of the Bank's policy prohibiting sexual

7  harassment, and warning that if either were to engage in similar

8  conduct in the future, they would be terminated.   In addition to

9  the disciplinary memo, Mr. Kitchen, Mr. Dobbins, and Branch

10  Manager Dave McMahon agreed that it would be appropriate to

11  transfer Mr. Ulibarri to the Lemoore branch and order that Mr.

12  Ulibarri and Ms. Chandler not have any contact with each other

13  except as necessary for business purposes.   They instructed Mr.

14  Ulibarri that if he were to call the Hanford branch and Ms.

15  Chandler were to answer the phone, he should immediately ask to

16  speak with somebody else.   Mr. Ulibarri continued to work for

17  Dave McMahon, and would attend very brief weekly meetings of Loan

18  Officers at the Hanford branch.   Ms. Chandler and Mr. Ulibarri,

19  however, did not have any interactions when Mr. Ulibarri attended

20  these meetings.

21    38.   In March 2006, before the allegations of "harassment"

22  surfaced, Dave McMahon received a complaint that Ms. Chandler had

23  released confidential information regarding one of the Bank's

24  clients.   He received a call from a manager at one of the Bank's

25  other branches who relayed that a customer called her and said

26  that he had been in the gym, and Ms. Chandler was frequently

27  coming into the gym and "hitting on him."   At one point, when

28  other people were close enough to hear, Ms. Chandler asked him

15

1  why he had removed his wife's name from a trust document and why

2  was he trying to hide money from his ex.  Mr. McMahon spoke to

3  this customer personally and verified the nature of his

4  complaint.  When Mr. McMahon relayed this complaint to Ms.

5  Chandler and asked her about it, she denied everything.  He told

6  her that if this had occurred, it would be grounds for

7  termination.  However, the customer was not willing to make any

8  type of a written complaint, and given that there was no way to

9  prove that Ms. Chandler had engaged in this conduct, he did not

10  believe it was grounds for terminating her employment at that

11  time.

12      39.   However, in December 2006, another customer contacted

13  Dave McMahon to relay a complaint about Ms. Chandler.  This

14  customer complained that she had been a long-time customer of the

15  Bank.  She frequently chatted with Ms. Chandler when she visited

16  the Branch, and they eventually commiserated about their

17  respective divorces and child-custody battles.  Ms. Chandler

18  volunteered, for example, that she followed her ex-husband and

19  his girlfriends.  Ms. Chandler also stated that she could look up

20  anyone's finances at the bank before she dated them.  In the

21  course of these conversations the customer stated that Ms.

22  Chandler also made inappropriate comments about men and sex, for

23  example, that men are only good for sex and that married men are

24  the best because there is no commitment.  Later, the customer got

25  engaged and informed Ms. Chandler of this fact.  Ms. Chandler

26  asked who her fiancé was and what he did for a living.  The

27  customer told Ms. Chandler her fiancé's name and that he was a

28  doctor.  Ms. Chandler replied that she was lucky to find a single

doctor.   The customer related that over the next few months, Ms.
Chandler became increasingly interested in her fiancé, and even
started showing up at his doctor's office.   Her fiancé asked her
how she knew Ms. Chandler and relayed that Ms. Chandler had made
advances towards him and made inappropriate comments to him.   She
was reluctant to provide more details about this to Mr. McMahon
due to doctor-patient confidentiality, but added that her husband
started leaving his office door open whenever Ms. Chandler
visited because he was worried about a "sexual harassment suit."
The customer also stated that she had seen Ms. Chandler in the
same gym frequented by her and her husband, and observed Ms.
Chandler following her husband around the gym.   Each time he
would move to a new machine, Ms. Chandler would move to the
machine right next to him even though there were plenty of other
free machines.   She and her husband then changed their gym
membership to another gym to avoid Ms. Chandler.   This customer
promised to reduce her complaint about Ms. Chandler to writing,
and eventually forwarded a written complaint on January 24, 2007.
In her written complaint, she asked that her name be kept
confidential because she was concerned about what Ms. Chandler
might do.

　　　40.   Due primarily to these two customer complaints, Mr.
McMahon recommended to Tom Dobbins and Bill Kitchen that Ms.
Chandler be terminated.   After reviewing the situation, Mr.
Kitchen and Mr. Dobbins approved Mr. McMahon's recommendation.
On or about February 5, 2007, Mr. McMahon and Ms. Hopper met with
Ms. Chandler and informed her that her employment was being
terminated due to customer complaints regarding inappropriate

behavior and release of confidential information to unauthorized persons.

IV.   Orders Re Amendments To Pleadings.

   1.   None contemplated at this time.

V.   Factual Summary.

   A.   Admitted Facts Which Are Deemed Proven Without Further Proceedings.

      1.   Plaintiff was employed by Stockmen's Bank from April 14, 2003, to February 5, 2007, and worked at the Hanford Branch as a Customer Service Representative.

      2.   Defendant David McMahon is, and at all times mentioned in Plaintiff's Complaint, was the Branch Manager of the Hanford Branch of Stockmen's Bank.

      3.   Defendant Ginny Hopper is, and at all times mentioned in Plaintiff's Complaint, was the Operations Supervisor of the Hanford Branch of Stockmen's Bank.

      4.   Defendant Mark Ulibarri is, and at all times mentioned in Plaintiff's Complaint, was a Commercial Loan Officer at the Hanford Branch of Stockmen's Bank.

      5.   Defendant Bill Kitchen is, and at all times mentioned in Plaintiff's Complaint, was a Regional Manager at Stockmen's Bank.

      6.   Plaintiff made a complaint to Defendant Hopper alleging that Defendant Ulibarri was sexually harassing her.

      7.   Defendant Kitchen interviewed Ms. Chandler regarding her complaint of harassment.

      8.   Following Mr. Kitchen's investigation, both Ms. Chandler and Mr. Ulibarri were given a counseling memo reminding

18

1  them of the Bank's policy prohibiting sexual harassment in the

2  workplace, and advising them that any future violation of this

3  policy would result in termination.

4       9.   Ms. Chandler was terminated from her employment at

5  Stockmen's Bank on or about February 5, 2007.

6       B.   Contested Facts.

7       1.   Whether Mr. Ulibarri, in fact, engaged in any of

8  the alleged acts of "sexual harassment" described by Plaintiff in

9  her Complaint, including but not limited to:   Whether Mr.

10  Ulibarri insisted that Ms. Chandler share a ride with him to Las

11  Vegas following the Bank's holiday party in December 2005

12  (Complaint ¶ 15(b)); whether Mr. Ulibarri "propositioned" Ms.

13  Chandler in Las Vegas (Complaint ¶ 15(c)); whether Mr. Ulibarri

14  asked Ms. Chandler to visit Las Vegas one more time with him

15  (Complaint, ¶¶ 15(e) and 15(i)); whether Mr. Ulibarri ever

16  pursued Ms. Chandler romantically or sexually (Complaint,

17  ¶ 15(c)-(n)); whether Mr. Ulibarri ever grabbed and/or kissed Ms.

18  Chandler (Complaint ¶ 15(h)); whether M. Ulibarri asked Ms.

19  Chandler to have sex with him (Complaint ¶ 15(i)); whether Mr.

20  Ulibarri ever "ran his hand along the back of (Ms. Chandler's)

21  neck," or touched her in an unwelcome manner on any occasion

22  (Complaint ¶ 15(j)); whether Mr. Ulibarri ever grabbed Ms.

23  Chandler's "buttock" (Complaint ¶ 15(l)); whether Mr. Ulibarri

24  ever told Ms. Chandler they could have sex together on the

25  conference room table at the Bank before anyone else arrived

26  (Complaint, ¶ 15(m)); whether Mr. Ulibarri talked to Ms. Chandler

27  about his fantasies (Complaint ¶ 15(n)); whether Mr. Ulibarri

28  parked his car close to hers in the parking lot and told her that

1   it was a sign of what they should be doing (Complaint ¶ 15(o));

2   whether Ms. Chandler complained to Mr. Ulibarri's wife that Mr.

3   Ulibarri was harassing her (Complaint ¶ 15(p)).

4        2.   Whether Ms. Chandler's complaint of alleged

5   harassment to Ms. Hopper was fabricated.

6        3.   Whether Ms. Chandler violated Bank policy by

7   disclosing confidential customer account information on any

8   occasion.

9        4.   Whether Ms. Chandler pursued a romantic

10  relationship with Mr. Ulibarri.

11       5.   Whether Ms. Chandler confronted Mr. Ulibarri's

12  wife and tried to convince her that she should divorce Mr.

13  Ulibarri so that Ms. Chandler could be with Mr. Ulibarri.

14       6.   Whether Ms. Chandler obtained Mr. Ulibarri's

15  private, blocked telephone number by reviewing Mr. Ulibarri's

16  confidential bank account information.

17       7.   Whether Mr. Kitchen interviewed Mr. Ulibarri, Lisa

18  Risso, and Eva Ulibarri, as part of his investigation into Ms.

19  Chandler's complaint of harassment.

20       8.   Whether Defendant Ulibarri complained to Defendant

21  Kitchen that Ms. Chandler was harassing him and his wife and that

22  Ms. Chandler disclosed Mr. Ulibarri's confidential account

23  information to his wife.

24       9.   Whether, in March 2006, Branch Manager David

25  McMahon received a telephone call from a customer who complained

26  that Ms. Chandler approached him while at a gym and loudly asked

27  in front of other patrons why he had removed his ex-wife's name

28  from a trust document at the Bank and whether the complaint was

1   true.

2       10.   Whether, in March 2006, Branch Manager McMahon
3   confronted Ms. Chandler about the customer's complaint and she
4   denied all of it.

5       11.   Whether, in January 2007, Branch Manager Dave
6   McMahon received a written complaint from a customer that Ms.
7   Chandler had made inappropriate comments to her about men and
8   made inappropriate comments and advances towards her fiancé and
9   whether the complaint was true.

10      12.   Stockmen's Bank has a published policy,
11  disseminated to its employees, prohibiting sexual harassment in
12  the workplace.

13      13.   Whether Defendants, or any of them, or any of
14  Stockmen's employees treated Ms. Chandler any differently
15  following her complaint of harassment.

16  VI.   Legal Issues.

17      A.    Uncontested.

18      1.    Jurisdiction exists under 28 U.S.C. § 1331 and
19  Title VII of the Civil Rights Act of 1964.

20      2.    Venue is proper under 28 U.S.C. § 1391.

21      3.    The parties agree that for supplemental claims,
22  the substantive law of the State of California provides the rule
23  of decision.

24      4.    Defendant Stockmen's Bank is an "employer" as that
25  term is defined in California Government Code § 12926(d) and in
26  42 U.S.C. § 2000e, et seq.

27      B.    Contested.

28      1.    Whether Defendants, or any of them, sexually

21

harassed Plaintiff, including whether any of the alleged harassing conduct attributed to Defendant Ulibarri was unwelcome; whether such conduct was severe and/or pervasive and/or whether such conduct affected the terms, conditions or privileges of Plaintiff's employment.

2.    Whether Defendants, or any of them, discriminated against Plaintiff in compensation or in terms, conditions, or privileges of employment because of her gender.

3.    Whether Defendants, or any of them, retaliated against Plaintiff in compensation or in terms, conditions, or privileges of employment because she complained of sexual harassment.

4.    Whether Defendant Ulibarri is a "supervisor" under the California Fair Employment and Housing Act and/or Title VII of the Civil Rights Act of 1964.

5.    Whether Defendant Ulibarri is personally liable under any cause of action asserted in Plaintiff's complaint.

6.    Whether Defendant McMahon is personally liable under any cause of action asserted in Plaintiff's complaint.

7.    Whether Defendant Hopper is personally liable under any cause of action asserted in Plaintiff's complaint.

8.    Whether Defendant Kitchen is personally liable under any cause of action asserted in Plaintiff's complaint.

9.    Whether Plaintiff unreasonably delayed in complaining of the alleged harassment.

10.    Whether Defendants took prompt, effective remedial action in response to Plaintiff's complaint of sexual harassment.

11.    Whether Plaintiff's termination was for a

1   legitimate business reason.

2          12.   Whether Plaintiff can establish that the reasons
3   for her termination were pretextual and the real reason was
4   unlawful retaliation or discrimination.

5          13.   Whether Plaintiff has exercised due diligence to
6   mitigate her damages, if any.

7          14.   Whether an officer, director, or managing agent of
8   Stockmen's Bank acted with or ratified conduct amounting to
9   malice, oppression or fraud toward Plaintiff, entitling her to an
10  award of punitive damages.

11         15.   Whether Plaintiff exhausted her administrative
12  remedies under the California Fair Employment and Housing Act
13  and/or under Title VII of the Civil Rights Act of 1964.

14  VII. Consent to Magistrate Judge Jurisdiction.

15         1.   The parties have not consented to transfer the
16  case to the Magistrate Judge for all purposes, including trial.

17  VIII.      Corporate Identification Statement.

18         1.   Any nongovernmental corporate party to any action in
19  this court shall file a statement identifying all its parent
20  corporations and listing any entity that owns 10% or more of the
21  party's equity securities.  A party shall file the statement with
22  its initial pleading filed in this court and shall supplement the
23  statement within a reasonable time of any change in the
24  information.

25  IX.  Discovery Plan and Cut-Off Date.

26         1.   The parties will make their Rule 26 disclosures on or
27  before December 31, 2007.

28         2.   The parties are limited 10 depositions per side, unless

23

otherwise modified by stipulation or court order.  Fed. R. Civ. P. 30(a)(2)(A).  The parties agree that each party may serve no more than 50 interrogatories on any other party, unless otherwise modified by stipulation or court order.  Both parties reserve the right to take depositions of the parties of more than one day's duration, subject to the parties' agreement.  The parties do not propose any additional changes to the limits on discovery as set forth in the Federal Rules of Civil Procedure at this time.

3.    The parties are ordered to complete all discovery on or before March 2, 2009.

4.    The parties are directed to disclose all expert witnesses, in writing, on or before January 2, 2009.  Any supplemental or rebuttal expert disclosures will be made on or before February 2, 2009.  The parties will comply with the provisions of Federal Rule of Civil Procedure 26(a)(2) regarding their expert designations.  Local Rule 16-240(a) notwithstanding, the written designation of experts shall be made pursuant to F. R. Civ. P. Rule 26(a)(2), (A) and (B) and shall include all information required thereunder.  Failure to designate experts in compliance with this order may result in the Court excluding the testimony or other evidence offered through such experts that are not disclosed pursuant to this order.

5.    The provisions of F. R. Civ. P. 26(b)(4) shall apply to all discovery relating to experts and their opinions. Experts may be fully prepared to be examined on all subjects and opinions included in the designation.  Failure to comply will result in the imposition of sanctions.

///

24

1   **X.   Pre-Trial Motion Schedule.**

2        1.   All Non-Dispositive Pre-Trial Motions, including any

3   discovery motions, will be filed on or before March 16, 2009, and

4   heard on April 17, 2009, at 9:00 a.m. before Magistrate Judge

5   Gary S. Austin in Courtroom 10.

6        2.   In scheduling such motions, the Magistrate

7   Judge may grant applications for an order shortening time

8   pursuant to Local Rule 142(d).  However, if counsel does not

9   obtain an order shortening time, the notice of motion must comply

10   with Local Rule 251.

11        3.   All Dispositive Pre-Trial Motions are to be

12   filed no later than March 30, 2009, and will be heard on May 4,

13   2009, at 10:00 a.m. before the Honorable Oliver W. Wanger, United

14   States District Judge, in Courtroom 3, 7th Floor.  In scheduling

15   such motions, counsel shall comply with Local Rule 230.

16   **XI.  Pre-Trial Conference Date.**

17        1.   June 8, 2009, at 11:00 a.m. in Courtroom 3, 7th Floor,

18   before the Honorable Oliver W. Wanger, United States District

19   Judge.

20        2.   The parties are ordered to file a Joint Pre-

21   Trial Statement pursuant to Local Rule 281(a)(2).

22        3.   Counsel's attention is directed to Rules 281

23   and 282 of the Local Rules of Practice for the Eastern District

24   of California, as to the obligations of counsel in preparing for

25   the pre-trial conference.  The Court will insist upon strict

26   compliance with those rules.

27   **XII. Trial Date.**

28        1.   July 21, 2009, at the hour of 9:00 a.m. in Courtroom 3,

1 | 7th Floor, before the Honorable Oliver W. Wanger, United States
2 | District Judge.

3 |     2.    This is a jury trial.

4 |     3.    Counsels' Estimate Of Trial Time:

5 |          a.   10 days.

6 |     4.    Counsels' attention is directed to Local Rules
7 | of Practice for the Eastern District of California, Rule 285.

8 | XIII.     Settlement Conference.

9 |     1.    A Settlement Conference is scheduled for March 11,
10 | 2009, at 10:00 a.m. in Courtroom 10 before the Honorable Gary S.
11 | Austin, United States Magistrate Judge.

12 |     2.    Unless otherwise permitted in advance by the
13 | Court, the attorneys who will try the case shall appear at the
14 | Settlement Conference with the parties and the person or persons
15 | having full authority to negotiate and settle the case on any
16 | terms at the conference.

17 |     3.    Permission for a party [not attorney] to attend
18 | by telephone may be granted upon request, by letter, with a copy
19 | to the other parties, if the party [not attorney] lives and works
20 | outside the Eastern District of California, and attendance in
21 | person would constitute a hardship.  If telephone attendance is
22 | allowed, the party must be immediately available throughout the
23 | conference until excused regardless of time zone differences.
24 | Any other special arrangements desired in cases where settlement
25 | authority rests with a governing body, shall also be proposed in
26 | advance by letter copied to all other parties.

27 |     4.    Confidential Settlement Conference Statement.
28 | At least five (5) days prior to the Settlement Conference the

parties shall submit, directly to the Magistrate Judge's
chambers, a confidential settlement conference statement.  The
statement should not be filed with the Clerk of the Court nor
served on any other party.  Each statement shall be clearly
marked "confidential" with the date and time of the Settlement
Conference indicated prominently thereon.  Counsel are urged to
request the return of their statements if settlement is not
achieved and if such a request is not made the Court will dispose
of the statement.

    5.   The Confidential Settlement Conference
Statement shall include the following:

        a.   A brief statement of the facts of the
case.

        b.   A brief statement of the claims and
defenses, i.e., statutory or other grounds upon which the claims
are founded; a forthright evaluation of the parties' likelihood
of prevailing on the claims and defenses; and a description of
the major issues in dispute.

        c.   A summary of the proceedings to date.

        d.   An estimate of the cost and time to be
expended for further discovery, pre-trial and trial.

        e.   The relief sought.

        f.   The parties' position on settlement,
including present demands and offers and a history of past
settlement discussions, offers and demands.

XIV. Request For Bifurcation, Appointment Of Special Master,
Or Other Techniques To Shorten Trial.

    1.   The parties agree that the issue of the amount of

27

1  punitive damages, if any, shall be tried in a second phase before

2  the same jury, after the establishment of liability and

3  entitlement to punitive damages, if any.

4  XV.   Related Matters Pending.

5       1.   There are no related matters.

6  XVI. Compliance With Federal Procedure.

7       1.   The Court requires compliance with the Federal

8  Rules of Civil Procedure and the Local Rules of Practice for the

9  Eastern District of California.  To aid the court in the

10 efficient administration of this case, all counsel are directed

11 to familiarize themselves with the Federal Rules of Civil

12 Procedure and the Local Rules of Practice of the Eastern District

13 of California, and keep abreast of any amendments thereto.

14 XVII.     Effect Of This Order.

15      1.   The foregoing order represents the best

16 estimate of the court and counsel as to the agenda most suitable

17 to bring this case to resolution.  The trial date reserved is

18 specifically reserved for this case.  If the parties determine at

19 any time that the schedule outlined in this order cannot be met,

20 counsel are ordered to notify the court immediately of that fact

21 so that adjustments may be made, either by stipulation or by

22 subsequent scheduling conference.

23      2.   Stipulations extending the deadlines contained

24 herein will not be considered unless they are accompanied by

25 affidavits or declarations, and where appropriate attached

26 exhibits, which establish good cause for granting the relief

27 requested.

28      3.   Failure to comply with this order may result in

28

the imposition of sanctions.

IT IS SO ORDERED.

**Dated:** __December 11, 2007__          _____/s/ Oliver W. Wanger_____
                                         UNITED STATES DISTRICT JUDGE